# MEMORANDUM ENDORSED

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _4/24/2020_

## SAPONE & PETRILLO, LLP

William S. Petrillo, Esq., Partner
Edward V. Sapone, Esq., Partner

Chase S. Ruddy, Esq., Senior Associate
Michael Vitaliano, Esq., Associate

<u>MANHATTAN</u>
1 Penn Plaza, Suite 5315
New York, New York 10119
Telephone: (212) 349-9000
Facsimile: (212) 349-9003
E-mail: ed@saponepetrillo.com

<u>LONG ISLAND</u>
1103 Stewart Avenue, Suite 200
Garden City, New York 11530
Telephone: (516) 678-2800
Facsimile: (516) 977-1977
E-mail: william@saponepetrillo.com

April 24, 2020

Hon. Gregory H. Woods
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:     *United States v. Irizarry, et al.*
        <u>Docket No.: 20-CR-127</u>

Dear Judge Woods:

I am CJA counsel to Defendant Christian Irizarry in the above referenced case. I write on behalf of Mr. Irizarry to request that the Court release him on a $250,000 personal recognizance bond, secured by the signatures of eight financially responsible people, and with all of the conditions, including home detention with electronic monitoring, that the Court imposed on Mr. Irizarry's co-defendant, Antonio Reyes. In the alternative, we would ask that the Court order a detention hearing to be conducted by telephone, pursuant to the terms set forth in the CARES Act, or pursuant to the recently implemented video-conferencing technology, which would allow Mr. Irizarry to participate in the hearing from the MCC.

Mr. Irizarry was arrested on February 18, 2020. On that date, he was presented before the Hon. Barbara Moses and consented to detention without prejudice. He has remained detained at the MCC New York since that date. Mr. Irizarry, along with Mr. Reyes, is charged by indictment with participating in a conspiracy to distribute and possess with intent to distribute heroin between approximately 2017 and 2019. As charged in the single-count indictment, it is alleged that Mr. Irizarry was involved in the distribution of 100 grams and more of mixtures and substances containing a detectable amount of heroin in violation of 21 U.S.C. 841(a)(1) & (b)(1)(B). If convicted after trial, Mr. Irizarry would face a five-year mandatory minimum sentence and a 40-year maximum sentence. There are no allegations of violence or that Mr. Irizarry used or possessed a firearm in furtherance of the instant narcotics conspiracy.

We concede that Mr. Irizarry is charged with an offense which subjects him to a statutory presumption of detention pursuant to 18 U.S.C. §3142(e). When such a presumption arises, a defendant bears the limited initial burden of production by coming forward with some evidence to

rebut the presumption. Once the defendant does that, the government shoulders the burden to prove by clear and convincing evidence that the defendant poses a risk of danger to another person or the community, and by a preponderance of the evidence that the defendant poses a risk of flight. *See* 18 U.S.C. 3142(f).

Respectfully, the proposed conditions of release are sufficient to rebut the presumption in this case and to ensure Mr. Irizarry's presence at future court dates and the safety of the community. The proposed conditions of release would also allow Mr. Irizarry to assist in his own defense, which he is not currently able to do at the MCC, thereby ensuring his rights under the Fifth and Sixth Amendment and would ensure Mr. Irizarry's health and safety during the current pandemic.

THE COURT SHOULD RELEASE MR. IRIZARRY ON HIS PROPOSED $250,000 BOND
WITH THE REQUESTED CONDITIONS OF RELEASE

Mr. Irizarry's proposed bail package, including a $250,000 bond secured by eight signatures of financially responsible people, in conjunction with the conditions of release imposed on Mr. Irizarry's co-defendant Antonio Reyes, including home detention with electronic monitoring at his mother's home, is enough to ensure Mr. Irizarry's appearance and the safety of the community.

The Bail Reform Act of 1984, codified at Title 18 United States Code Section 3142, directs that a "judicial officer shall order the pretrial release of a person … subject to the least restrictive … condition or combination of conditions that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community ...." 18 U.S.C. § 3142(c)(1)(B).

The factors the court considers in determining whether conditions exist that will reasonably assure the defendant's appearance and the safety of the community include:

(1)     the nature and circumstances of the offense charged, including whether the offense is a crime of violence;

(2)     the weight of the evidence;

(3)     the history and characteristics of the defendant including:

(a) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(b) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4)    the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. §3142(g).

Under the Bail Reform Act, "it is only a 'limited group of offenders' who should be denied bail pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir.1987)(quoting S.Rep. No. 98-225, at 7 (1984). Congress recognizes "the traditional presumption favoring pre-trial release 'for the majority of Federal defendants.'" *Berrios-Berrios*, 791 F.2d at 250, *cert. denied*, 479 U.S. 978 (1986) (quoting S. Rep. No. 98-225, reprinted in 1984 U.S.C.C.A.N. 3182). "[I]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). "Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning." *Stack v. Boyle*, 342 U.S. 1, 4 (1951).

Defendants charged with certain offenses, however, are subject to a statutory presumption of detention. *See* 18 U.S.C. §3142(e). 21 U.S.C. §841(a) is one of the offenses that triggers the presumption. *See id.* When such a presumption arises, a defendant bears the limited initial burden of production by coming forward with some evidence. Once the defendant does that, the government shoulders the burden to prove by clear and convincing evidence that the defendant poses a risk of danger to another person or the community, and by a preponderance of the evidence that the defendant poses a risk of flight. *See* 18 U.S.C. 3142(f).

Mr. Irizarry is admittedly charged with a serious offense. He is accused of being involved in the distribution of heroin over a multi-year period. As a result, he is currently faced with a potential five-year mandatory minimum sentence, and no doubt correspondingly high Guidelines. Additionally, the charged conduct is alleged to have occurred while Mr. Irizarry was serving a probationary sentence following a conviction in New York State for the misdemeanor offense of Criminal Possession of a Controlled Substance in the Seventh Degree. It is worth noting, however, that there are no allegations of violence in this case, and no allegations that Mr. Irizarry ever possessed a firearm. While he has a fairly lengthy criminal history, the majority of Mr. Irizarry's prior convictions are for misdemeanor drug offenses, and there is no history of violence that indicates that Mr. Irizarry would pose a danger to any one person or the community if released.

Mr. Irizarry also does not pose a risk of flight. While Mr. Irizarry has a bench warrant history, his last failure to appear was 10 years ago, and his track record for appearing far outweighs the few times he did not appear as directed. Those historical events do not lend themselves to a reliable prediction of whether Mr. Irizarry will appear in this case, especially in light of the powerful moral suasion of the eight proposed suretors and the confining circumstances of the pandemic.

While issues such as a defendant's criminal history, the strength of the evidence or seriousness of the case, and the depth of the advisory Guidelines a defendant faces are important considerations in any bail analysis, they are not the only part of the analysis and should not be viewed in a vacuum. Mr. Irizarry maintains strong familial and community support. He is a United States citizen who was born and raised in New York City. His entire family lives in New York. The only time Mr. Irizarry traveled outside the country was when he was a young boy. He has not

traveled internationally since. He has strong ties to New York City, including being a primary caregiver to his four-year-old son, for whom he does just about everything. He has very limited financial resources, and under the circumstances of the current pandemic, even if he were inclined to, Mr. Irizarry's ability to travel outside New York is extraordinarily limited.

And, Mr. Irizarry does not offer two, three, or even four people to support his proposed bond; he offers eight family members and close friends who are ready and willing to support him by securing his bond:

(1) Rosanna Minaya – has been a close friend and neighbor of Mr. Irizarry's for the past 11 years ($25,000 annual income);

(2) Maria Nunez – has been a friend of Mr. Irizarry's for three years, and is the girlfriend of another of Mr. Irizarry's close friends ($15,000 annual income);

(3) Ruth Muniz – is Mr. Irizarry's girlfriend, and has known him for more than 10 years ($18,000 annual income);

(4) Pamela Luna – Ms. Luna is Ruth Muniz's niece. Mr. Irizarry is the godfather of Ms. Luna's daughter ($17,000 annual income);

(5) Cynthia Rodriguez - life-long friend of Mr. Irizarry ($53,000 annual income);

(6) Aaron Dinapolis Morales – life-long friends of Mr. Irizarry ($15,000 annual income);

(7) Juan Fonseca-Rosado - life-long friends of Mr. Irizarry ($40,000 annual income);

(8) Brenda Loporena – close family friend of Mr. Irizarry, who previously served as his babysitter when he was young ($46,000 annual salary).

Together these eight proposed suretors make a combined $229,000 per year. As such, they carry the ability to satisfy a judgment well in excess of $250,000, and each possesses moral suasion over Mr. Irizarry to ensure that he adheres to all conditions of pre-trial release. *See United States v. Melville*, 309 F.Supp. 824, 826-27 (S.D.N.Y. 1970) (noting that "the court is entitled to have a moral as well as a financial assurance [...] of the defendant's appearance in Court when required").

Appropriate factors to consider when weighing whether a proposed suretor exercises **moral suasion** vary from case to case but may include the strength of the ties between the suretor and defendant (i.e. family or close friend), the defendant's roots in the community, and the regularity of contact between suretor and defendant. *See United States v. Batista*, 163 F.Supp.2d 222, 224 (S.D.N.Y. 2001).

Here, each of the proposed suretors has close ties to Mr. Irizarry and, prior to his arrest in February, were all in regular contact with him. All of the proposed suretors live in New York City, and most live in close proximity to where Mr. Irizarry grew up and continues to live to this day. The proposed $250,000 bond is a very large sum of money for these people. They all work hard

for modest salaries and have families of their own to help support. Combined with the significant moral suasion provided by its suretors, this bond is likely to ensure Mr. Irizarry's return to court and the safety of the community. Any failure by Mr. Irizarry would cause financial devastation to those close to him.

Mr. Irizarry's proposed bail package also contains conditions sufficient to ensure the safety of the community. Congress has stated that it is a small group of "particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community." S. Rep. No. 225, 98th Cong., 1st Sess. 6-7, *reprinted in* 1984 U.S. Code Cong. & Ad. News, P.L. 98-473, at 3188-3189. (Senate Report). Congress has emphasized that only where there is a **strong probability** that a person will commit additional crimes if released is the need to protect the community sufficiently compelling that **detention** is, on balance, appropriate. *See id.,* at 3189 (emphasis added).

Mr. Irizarry is not one of those particularly dangerous defendants. While he is charged with violations of the narcotics laws, the nature and circumstances of his case strongly militate in favor of pre-trial release. The allegations against Mr. Irizarry in the indictment involve no violence, witness tampering, or the use of weapons. And under the circumstances of Mr. Irizarry's proposed bail package, he does not pose a threat of engaging in criminal activity if released. Under these conditions, Mr. Irizarry would be subject to confinement in his mother's home with 24-hour electronic monitoring. Further, the conditions posed by the current pandemic present significant barriers to anyone attempting to engage in criminality, especially someone like Mr. Irizarry who will be confined to his mother's apartment and closely monitored.

Therefore, under normal circumstances, I submit that Mr. Irizarry is a good candidate for release on the requested $250,000 bond together with the proposed conditions.

Respectfully, Mr. Irizarry's release is further supported by the conditions of confinement created by the current COVID-19 pandemic, including its effect on Mr. Irizarry's ability to participate in his own defense, and the virus' potential effects on Mr. Irizarry's physical health.

The Bail Reform Act "permit[s] the temporary release of the person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). Judge Nathan, in her recent decision in *U.S. v. Dante Stephens* (15-CR-095), found that "[c]ompelling reasons may exist where release is necessary for the preparation of the defendant's defense … or where the defendant's serious medical conditions warrant release." Judge Nathan went on to find in *Stephens* that "the obstacles the current public health crisis poses to the preparation of the Defendant's defense constitute a compelling reason [to release the Defendant] under 18 U.S.C. § 3142(i)." *United States v. Stephens*, 15-CR-95 (AJN) (Mar. 19, 2020)(releasing the defendant concluding that in light of changed circumstances, Mr. Stephens does not pose a danger to the community); *see also United States v. Perez*, 19-CR-297 (PAE) (Mar. 19, 2020) (concluding "compelling reasons exist for temporary release of the defendant from custody during the current public health crisis").

The first compelling reason supporting Mr. Irizarry's release is that he suffers from a medical condition that puts him at higher risk for serious consequences should he contract COVID-

19. Mr. Irizarry suffers from asthma, for which he reportedly used an inhaler prior to his incarceration. According to his family, Mr. Irizarry went to Lincoln Medical Center in the Bronx for asthma attacks in November and December 2019[1] and there is a family history of asthma.

The CDC has issued guidance that individuals at higher risk of serious complications from COVID-19—adults over 60 years old and people with chronic medical conditions—take immediate preventative actions, including avoiding crowded areas and staying home as much as possible.[2]

Conditions of confinement create the ideal environment for the transmission of contagious disease.[3] Inmates cycle in and out of BOP administrative facilities like the MCC from all over the world and the U.S. The current travel bans do not remove the danger, and people who work in the facilities leave and return daily. Incarcerated people have poorer health than the general population, and even at the best of times, medical care is limited in detention centers.[4] According to public health experts, detained individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[5]

The MCC houses approximately 700 people. The majority of the people detained are housed in small, two-person cells with a shared toilet and sink; they eat meals and have recreation in groups of 70 or more. The medical care has repeatedly failed to adequately address even routine medical conditions such as diabetes, pregnancy, and anemia.[6] In times of crisis, the medical care has halted entirely.

While the BOP has put transmission mitigation measures in place for COVID-19,[7] Judge Nathan, wrote in *Stephens* that "in the event of an outbreak at the Metropolitan Correctional Center, substantial medical and security challenges would almost certainly arise." The MCC is only reporting one current confirmed case among inmates, but it is reporting 31 cases among staff.[8] And given a widespread lack of testing, we suspect that the actual number of both inmates and

---

[1] We have tried to obtain medical records to supply to the Court, but the family is not in possession of any medical records, and we have been unable to secure a HIPAA authorization to obtain the records directly from the hospital.

[2] *People at Risk for Serious Illness from COVID-19*, CDC (March 12, 2020) *at* https://bit.ly/2vgUt1P.

[3] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, *at* https://doi.org/10.1086/521910.

[4] Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, *at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf

[5] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at* https://bit.ly/2W9V6oS.

[6] *E.g., National Association of Women Judges (NAWJ) Women in Prison Committee (WIP) Second Visit to BOP's Metropolitan Detention Center (MDC), Brooklyn, New York, June 3, 2016*, *at* https://bit.ly/39JRhdW.

[7] *see* Federal Bureau of Prisons, *Federal Bureau of Prisons COVID-19 Action Plan*, https://www.bop.gov/resources/news/20200313_covid-19.jsp.

[8] COVID-19 Cases (April 23, 2020), *available at* https://www.bop.gov/coronavirus/.

staff who have been infected is actually much higher. Further, additional people continue to be arrested in the Southern District of New York—people who have been exposed in the community as the coronavirus spreads. If they are not symptomatic, they will be brought into the MCC potentially infected. And they will be held with the existing population in very close quarters under poor sanitary conditions.

Therefore, given the dangerous conditions posed by the virus in an environment like MCC, where Mr. Irizarry has no opportunity for social distancing and little opportunity to maintain adequate hygiene and cleanliness, and given his underlying respiratory condition, the potential consequences to his health posed by the virus present a compelling reason for his release.

The second compelling reason supporting Mr. Irizarry's release is the effect the virus, and the BOP's efforts to mitigate the spread of the virus, has had on Mr. Irizarry's ability to participate in his own defense. The BOP has instituted Phase Five of its COVID-19 Action plan, locking down inmates at all BOP facilities across the country.[9] What that has meant for Mr. Irizarry, is that he is locked in his cell at MCC for 24 hours per day. He is let out for a total of three hours each week, one hour three times per week, to shower, and call or email his family. Legal calls have been permitted only when compelling reasons justify and have been limited to 15 minutes by MCC staff who are performing triage given the number of requests. A new policy implemented this week is intended to expand legal calls to 30 minutes, but the number of calls that can be accommodated each day are limited as the calls must be scheduled between 1:00-3:30 daily.

We have received a significant amount of discovery in Mr. Irizarry's case including surveillance video, recorded purchases of narcotics, Title III wiretaps, and social media, among other categories of evidence. A common theme among this evidence is that Mr. Irizarry must have access to a computer in order to review it. That is impossible under the current conditions at the MCC. Mr. Irizarry has no access to the law library, no access to a computer to review the discovery on his unit and is only allowed out of his cell for three hours per week, which is his only time to shower and communicate with his family.

These conditions are not expected to meaningfully change for several weeks, at a minimum, and could stretch, at least in some form, for several months to come. Without the ability to review discovery, and without the ability to communicate with counsel in any meaningful way, it is impossible for Mr. Irizarry to participate in his own defense. At the very least, his 6th amendment right to the effective assistance of counsel is being violated.

Therefore, for all of the reasons set forth above, the Court should release Mr. Irizarry pursuant to the requested $250,000 bond secured by the signatures of the eight proposed financially responsible suretors, and the conditions of release imposed upon his co-defendant Antonio Reyes, including home detention with electronic monitoring at Mr. Irizarry's mother's apartment, which will allow him to remain safe and healthy and permit him to participate in his own defense. In the alternative, we ask that the Court schedule a telephonic or video detention hearing so that the issues raised in Mr. Irizarry's motion may be further litigated.

---

[9] Bureau of Prisons COVID-19 Action Plan: Phase Five, available at https://files.mail-list.com/f/nysacdl-federal/srdQ4vUyOOXSMbO3-BOP.pdf

We have conferred with AUSA Sarah Krissoff, who expects that the government will oppose Mr. Irizarry's motion for release on bond. We also reached out to Pretrial Services for their position. Because Mr. Irizarry waived his interview at the time of his initial presentment, no pretrial services report was created, and Pretrial Services is not in a position to express an informed opinion regarding the appropriateness of Mr. Irizarry's release on the proposed bond and conditions. If necessary, we are prepared to coordinate with Pretrial Services to have Mr. Irizarry interviewed

I thank Your Honor for your consideration and wish everyone well.

Respectfully submitted,

/s/ *Edward V. Sapone*
Edward V. Sapone

Cc:     Sarah Krissoff, Esq.
        Assistant United States Attorney

Application granted in part.  The Court anticipates that it will schedule a bail review hearing by video conference on the morning of May 4, 2020.  To do so, counsel for defendant is directed to provide the Court with the following information no later than 10:00 a.m. on April 27, 2020:  (1) whether counsel wishes to confer with his client in the fifteen minute window prior to the conference, and, if so, at what telephone number, (2) whether Mr. Irizarry requires the services of an interpreter, and (3) confirmation that Mr. Irizarry is incarcerated at the MCC.

SO ORDERED
April 24, 2020   _____
                 GREGORY H. WOODS
                 United States District Judge